UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

      -v-

RANDY TORRES

        Defendant.

16-CR-809 (VM)

---

**<u>SENTENCING SUBMISSION ON BEHALF OF RANDY TORRES</u>**

## **INTRODUCTION**

On February 24, 2020, Randy Torres ("Randy" or "Mr. Torres") was found guilty of Count One of the indictment, Racketeering Conspiracy, and the jury determined the Government had proven the special sentencing allegation against Mr. Torres. Mr. Torres is scheduled to be sentenced before the Court on July 15, 2022. Given the jury's verdict, Mr. Torres expects to receive a significant sentence. This submission does not seek to downplay or diminish any of the loss of life or injuries suffered by anyone. Rather this submission seeks to provide the Court with the most accurate and complete picture of who Mr. Torres is, what he has been through, the good he has done and what he means to others. To help accomplish this goal, we have attached ten letters from family, friends and co-workers (*see* Exhibits B – K, attached hereto).

## **OBJECTIONS TO THE PRESENTENCING REPORT ("PSR")**

### *A.*  *The Base Offense Level Should Be § 2A1.3 and Not § 2A1.1 or  § 2A1.2*

On January 18, 2022, along with co-defendant Walston Owen, Mr. Torres submitted objections to the use of the offense of murder for the calculation of Mr. Torres' sentencing guideline range (*see* ECF Doc. No. 619). Specifically, Mr. Torres objected to the use of the offense of murder to calculate his base offense level. Mr. Torres re-asserts here that the correct offense to use for the calculation is voluntary manslaughter.

Mr. Torres asks the Court to find that his base level offense is twenty-nine (29). Coupled with a four (4) level increase under §3B1.1(a), Mr. Torres' total offense level should be thirty-three (33). Therefore, his sentencing guideline range should be 135 to 168 months.

### *B.*  *Support for Objections Made to the First Disclosure of the PSR*

Mr. Torres appreciates the United States Department of Probation ("Probation") reviewing his objections to the first disclosure of the PSR and making some modifications to the second

1

disclosure of the PSR. While Probation noted Mr. Torres' objections and summarized some of the support for those objections, the second disclosure left out the support provided for one of his objections. Mr. Torres brings this to the Court's attention here so that the Court has all the relevant information needed to determine whether to adopt all the findings in the PSR or order some modifications.

As to Paragraph 20 of the PSR, Mr. Torres made two objections (the PSR summarizes those objections on page 27 and contains two (2) footnotes on page 8). One of those objections was to the characterization of the assault where he was stabbed as an "inter-set" assault, rather than an "intra-set" assault. In support of that objection, Mr. Torres first brought to Probation's attention and now to the Court's, the following information. In other sections of the PSR, Probation correctly lays out that the Rollin' 30s are one set; and the CHC and HMC are both Rollin' 30s "subsets" or "lines" (*see* PSR ¶ 16). At trial, the Government's own cooperating witness Nathanial Rodriguez ("Mr. Rodriguez") testified that Crips fall into "Banners" such as "the Rollas and the Gangsters." Mr. Rodriguez further testified that under the "Banners" are "Sets," and that the Rollin' 30s are a set (*see* Trial Transcript ("TT") 305:7-24). Also, Mr. Rodriguez confirmed during the trial that CHC and HMC are both Rollin' 30s. (*See* TT 460:11-16 and 461:5-20).

This same support applies to Mr. Torres' objection contained in the PSR as to Paragraph 36 where he made the similar objection regarding the characterization of an "inter-set dispute," that should correctly be characterized as an "intra-set dispute."

### C. *Probations' Justification Section*

Included in the second disclosure of the PSR is a "Justification" section (*see* PSR page 32 ¶ 1). This section does not accurately portray Mr. Torres and his motivations. That is not to say this submission is challenging the jury verdict (although the defense does challenge that the offense

of murder was proven in regards to the sentencing enhancement) or that Mr. Torres had a leadership role. Rather the defense seeks to more accurately present Mr. Torres' participation and culpability. While Mr. Torres understands that he will receive a significant sentence for the offense conduct, that sentence should be based on what the trial record shows and the evidence proved.

### 1. *The Shooting of Philip Wiggins*

Mr. Torres has always denied any involvement in the April 16, 2016, shooting of Philip Wiggins a.k.a "Pressure" ("Mr. Wiggins"). Not only does Mr. Torres deny any involvement in the shooting, but Mr. Wiggins, himself, expressed in November of 2018 that he "did not believe that [Mr.] Torres committed the shooting" (*see* Government's Letter to Defendants, dated August 2, 2019, attached hereto as Exhibit A). The Government may seek to downplay this fact, which completely cuts against its theory. However, Mr. Wiggins stated this again to the Government's own witness, Shaquille Bailey ("Mr. Bailey"). During the cross-examination of Mr. Bailey, he testified that Mr. Wiggins spoke with him about the shooting. During this conversation, Mr. Wiggins stated to Mr. Bailey that he knew who shot him and that "it wasn't Rico." (*See* TT 1275:21 – 1276:2).

The Government has asserted that Mr. Bailey has been truthful with the Government and his testimony should be believed. Mr. Bailey testified at trial that he purchased a gun from Mr. Wiggins and that Mr. Wiggins was the supplier of the drugs he sold on the streets (*see* TT 1275:6-7 and 1273:23-1274:4). Clearly, a relationship in which these two men exchanged an illegal firearm and illegal drugs for money was one of trust. Therefore, Mr. Wiggins' statement to Mr. Bailey is reliable and further casts doubt on whether Mr. Torres played any role in the shooting of Mr. Wiggins.

The only evidence at trial that links Mr. Torres to the April 2016 shooting of Mr. Wiggins is testimony from the Government's witness Mr. Rodriguez. Mr. Rodriguez testified that after six months of a strained relationship, Mr. Torres came into the tattoo shop that Mr. Rodriguez worked at, and publicly confessed to Mr. Rodriguez that he shot Mr. Wiggins. They then discussed the incident again one week later (*see* TT 494:6-11; 497:1-6; 497:24-498:24; and 499:15-500:9). There is no corroborating evidence of any kind to suggest that either of these conversations ever took place, let alone that Mr. Torres participated in the shooting in any way.[1]

### 2.   *Other examples of Mr. Torres' conduct related to disputes*

The evidence shows that Mr. Torres solves his personal street disputes through using fists and not weapons. At trial, testimony by Mr. Rodriguez showed that at some point, Mr. Torres and "Spyder" were "dissing" each other in a Facebook post because Mr. Torres was dating "Spyder's" ex-girlfriend. (*See* TT 575:7-17). Mr. Torres' method of resolving this feud was to have a weaponless one on one fight with "Spyder." (*See* 3522-006, pages 7-8).

The evidence at trial further showed that Mr. Torres sought to avoid confrontations by trying to de-escalate conflicts. For example, Mr. Rodriguez and "Spyder" were at one time both members of the Rollin' 55s and they had a dispute about leadership. After Mr. Rodriguez joined the Rollin' 30s, he, with others, vandalized "Spyder's" van in an area that both the Rollin' 55s and the Wild Cards controlled. The Wild Cards were upset because such conduct brought about police attention. Though he denied remembering the conversation at trial, during one of his early proffers

---

[1] Further casting doubt that this conversation ever took place, is Mr. Rodriguez' inconsistent accounts of when it took place. At trial he said the conversation occurred in April of 2016, about six months after he stopped talking with Mr. Torres. In his proffer with the Government on April 13, 2018, he told the Government that from approximately two months after Mr. Suazo's death (on September 19, 2015) he did not speak to Mr. Torres for "about a year." (*See* 3522-011, page 14). That would mean he did not speak with Mr. Torres until November 2016, not April 2016.

with the Government, Mr. Rodriguez said that Mr. Torres made him apologize to the Wild Cards to avoid any escalating disputes. (*See* 3522-008, page 2).

Another prominent example is when "Premo," a leader and friend of Mr. Torres', was murdered by a member of another gang.  Mr. Torres did not seek to retaliate for "Premo's" death and was strongly criticized for this decision. At trial there was testimony about the ongoing conflict with the "Certifieds."  In an effort to prevent further violence, Mr. Torres told other members to avoid all contact with the "Certifieds" (*see* TT 934:10-21). Further when it was believed that "Dough Boy" was a "snitch," there was no order to attack him but Mr. Torres simply wanted other members to stay away from him (*see* TT 643:16-22).

Additionally at trial, there was testimony regarding "c-rips" or the beatings with fists of gang members either when they were first initiated into the gang or when they did something wrong. As the cooperators testified, Mr. Torres did not order or seek a "c-rip" for any of them when they joined the Rollin' 30s.[2]

Mr. Torres has been incarcerated since his arrest on March 26, 2019. As reported in the PSR at Paragraph 14, Mr. Torres has not had a single disciplinary infraction during his period of incarceration. His time has been spent at the Metropolitan Detention Center, Metropolitan Correctional Center and Westchester County Jail.

## PERSONAL HISTORY AND CHARACTERISTICS

### A.  *His Bronx was Always Burning*

Randy Torres was born Randy S. Villanueva on January 28, 1981, to Marilyn Villanueva ("Marilyn"), in the Bronx, New York. At the time of Randy's birth, Marilyn was in a relationship

---

[2] Mr. Rodriguez and Mr. Bailey both testified that they were "blessed in." (*See* TT 431:24-432:4; 869:10-14, and 870:5-10). Christopher Domena testified that he had a 30 second fight with boxing gloves to join. (*See* TT 1419:2-19 and 1420:5-14).

with an "Arabic man who went by the name 'Smokey'," Randy's biological father. Unfortunately, Randy's biological father was not present for his birth or his upbringing. The hapless relationship between Marilyn and "Smokey" meant that Marilyn never discussed him with Randy and to this day, Randy has no idea what "Smokey's" real name is. While Randy would see "Smokey" in the streets on a handful of occasions, he has no recollection of ever speaking to his biological father. This critical father-son relationship missing at birth and throughout Randy's life would have long-lasting effects and serious repercussions.

Randy was Marilyn's second child, her eldest child Randy's older brother, is Joey Villanueva ("Joey"). The two boys grew up together as they and their mother moved around the Bronx. As a young child, Randy's mother entered into a relationship with Joseph Torres ("Joseph"). Eventually, Marilyn and Joseph would legally marry, and she legally changed her children's last names to Torres.

The tumultuous relationship between Marilyn and Joseph, an alcoholic, was riddled with physical and emotional abuse aimed at Randy, Joey, and Marilyn. For example, when Randy was 7 years-old, Joseph, after drinking, would take him and Joey to an abandoned apartment in their building, and place them "in bullet proof vests" and shoot around them and over their heads from close range with a revolver. When either of the boys would cry, Joseph would "yell at them and hit them with the gun" (*see* PSR ¶ 69)[3]. Shortly after Marilyn learned that this had occurred on more than one occasion, she left Joseph. She, Randy, and Joey were homeless for a few months living with friends, on the streets or in shelters throughout the Bronx.

---

[3] Defense counsel did not object to the PSR's characterization of this event however, after meeting with Mr. Torres in person we fully understand the traumatic story more accurately. Mr. Torres and his brother were not shot but were made to stand in front of Joseph while he discharged the firearm around the boys.

After having no place to call home for three months, Marilyn started a relationship with Fernando Adorno ("Fernando") who moved Marilyn and the boys into his apartment. As before, the relationship between Fernando and Marilyn was fraught with problems. Fernando was often unfaithful and left the apartment for days. Randy feels that Fernando treated his mother unfairly but states that "he provided the best he could financially for Joey and me, two kids not really his, and he taught us about hard work, so I have respect for him for that." When Randy was around 8 years-old Fernando and Marilyn had a child together, Randy's half-sister, Marilyn M. Adorno ("Marilyn M.").

Around the time Randy turned twelve, his mother's physical health started to deteriorate. She had long suffered from nerve damage and the devastating effects of lupus, and as result, spent a great deal of time in the hospital. Further, at this time, Fernando was working non-stop to pay for her medical bills and what free time he had was spent with his various girlfriends. With both parents usually out of the home, it was on young Randy to take on the role of both mother and father to Marilyn M. For dinner, Randy would often "steal cans of SpaghettiOs" just to provide food for them (*see* PSR ¶ 71). Randy and Marilyn M. both report a "love hate relationship" with SpaghettiOs's. On the one hand, according to Randy, "we ate them cold out of the can, and they were disgusting that way. We ate so many of them, I hate them now, I hate even thinking of them now." On the other hand, according to Marilyn M., "a lot of nights we'd eat them on the fire escape together. I felt safe and we laugh[ed], so I loved that. I love that memory." As Marilyn M. got older and went to school, she recalled that Randy would be the one to take her to school and pick her up; and he "was always present for parent teacher night." She stated that "[a]lthough [Randy] was strict" with her she would "thank him today for showing [her] that [she] can be and do anything" (*see* Letter from Marilyn Adorno, attached hereto as Exhibit B).

7

During the time that Marilyn and Fernando were together, Randy and his siblings would sometimes be placed under the care of Randy's maternal grandparents, who lived in an apartment in the Bronx, New York. Randy described his grandparents as "strict Catholics" who longed disapproved of Marilyn's relationship with Randy's biological father; nevertheless, Randy recalled that his grandfather "doted" upon him; however, his grandmother was physically abusive when disciplining Randy (*see* PSR ¶¶ 70, 72). She was also physically abusive toward Marilyn M., Randy felt that at times he deserved the punishments but not Marilyn M., "I felt like she got beat for no reason and she got beat hard." Upon reflection, Randy stated that knowing his sister had been beaten was more hurtful to him than anything his grandmother did to him physically. Yet despite this, Randy says that he loved his grandmother. Nonetheless, the physical abuse he and his sister suffered was confusing to him as a child, "my dad, that I never met, just left. That hurt but he never physically hurt me. But here [was] a woman I know that loves me and wants me to do good, but she beat us like crazy."

Throughout Randy's early childhood and teen years, he witnessed various forms of violence perpetrated towards him or close family members. At the age of nine, during one of his stays with his maternal grandparents, he was the victim of a home invasion, after a "group of men" entered their apartment looking for money. One of the men "put a tip of a knife in one of his nostrils and threatened to 'put a hole in [his] nose'" if Randy attempted to run (*see* PSR ¶ 72).

At the age of 13, Randy walked in on an uncle attempting to sexually abuse his sister, Marilyn M., Randy physically intervened and stopped the incident (*see* PSR ¶ 74).

When Randy was 15 or 16 years-old, his mother attempted suicide. Randy, who was home at the time, stepped in and immediately saved his mother because as he recalled he "knew"

something was wrong. Thankfully, she survived, but that moment stayed with Randy and haunts him to this day.

Unfortunately, Randy would experience an almost identical traumatizing situation with his sister. Marilyn M., who was unable to cope with their mother's declining physical and mental health and the abuse she suffered at the hands of other family members also tried to take her own life but was thankfully found and saved by Randy (*see* PSR ¶ 73). While Randy characterizes finding and saving his sister as "dumb luck," Marilyn M. says he is her "guardian angel who has saved her multiple times in horrifying situations."

Sadly, Randy's mother Marilyn passed away on March 22, 2013, at the age of 50, from cancer. Randy's aunt Maira Villanueva reflected, "when [Randy's mother] passed away it tore his heart in a million pieces" (*see* Letter from Maira Villanueva, attached hereto as Exhibit C).

The abuse Randy suffered as a child at the hands of those who should have protected and cared for him have left both physical and emotional reminders and have had a lasting impact on the man standing before you to be sentenced. Randy's often-unstable home environment and horrific childhood provided the foundation for which he had to build upon to make his adult life.

### B. *Searching for Something, Finding a Gang*

Unfortunately, school provided no safe haven for Randy from the abuse in his home, as he experienced bullying from a young age. Some of Randy's earliest memories were walking through his neighborhood being called a "dirty a-rab" and "a terrorist." While the name-calling bothered Randy, the true pain came from thinking that these people calling him names seem to know more about his own biological father than he did. Randy was also much smaller than most boys his age and as result he was physically picked on. In one instance, he was kicked by a peer and as a result had to undergo surgery (*see* PSR ¶ 89).

When the time came for Randy to start high school, Fernando, wanting better for Randy, paid for him to attend a private school in the Bronx. Randy began attending St. Helena Commercial School.[4] Unfortunately, entrance into private school could not make up for the problems in Randy's childhood home nor those he witnessed in the streets. As a result of his unstable environment, his school attendance was poor and Randy was held back in ninth grade, twice.

Randy's harsh and often chaotic home environment was only equaled by the violent, drug-ridden neighborhood of the Bronx that he lived in during the late 1980's and early 1990's. Randy recalled that throughout his childhood he witnessed drug use, drug sales, and violent crime in his neighborhood describing it simply as "rough" (*see* PSR ¶ 67). At the age of 15, while failing in school and feeling lost at home, Randy joined the Rollin' 30s, a set of the Crips. Randy stated that he joined the Rollin' 30s because he was "missing something" and "wanted to feel loved, be safe, and [he] finally felt like [he] belonged." ***As a 15-year-old, Randy did not and could not, appreciate the significance of this choice and the impact it would have on the rest of his life.***

Randy was a child victim of violence not only in his home but also at school and in his neighborhood. This "exposure of multiple forms of victimization" is known as "polyvictimization" an important concept in understanding the effects of youth gang membership.[5] Research has shown that "childhood trauma and adversity increase the risk for future victimization as well as future perpetuation of violence."[5] In fact, a "reciprocal" association between delinquent behavior and trauma have been found in that "trauma increases risk for delinquency and gang involvement, and involvement in antisocial behavior increases risk for further traumatization and exposure to

---

[4] St. Helena Commercial School is now named Monsignor Scanlan High School in the Bronx, *see* website https://www.scanlanhs.edu/.

[5] Quinn, K., Pacella, M.L., Dickson-Gomez, J., & Nydegger, L.A. (2017). Childhood adversity and the continued exposure to trauma and violence among adolescent gang members. *American Journal of Community Psychology, 59*(1/2), 36-49. DOI:10.1002/ajcp.12123.

violence."[5] The consequences of such cumulative trauma are far reaching from negative psychological effects (i.e. depression, PTSD, substance use) to desensitization to violence, and aggressive behavior.[5]

Researchers have further found that "youth who join gangs experience noteworthy changes in their emotions, attitudes, and behavior" (quoting Melde and Esbensen).[6] Utilizing the social development model to understand the consequences of one's decision, the decision to join a gang during adolescence will re-structure one's "subsequent socialization" since as a member they are less likely to experience prosocial functioning across several domains (e.g., mental and physical health; illegal behavior; and educational and occupational attainment).[6] The resulting problematic behaviors will shape how they transition into that crucial stage of adolescence to adulthood.[6]

### C. *Ready or Not, Adulthood*

When the time came for Randy to be a father, the lasting effects of his early upbringing and the surrogate family he found in the Rollin' 30s came into fruition. As the PSR notes, Randy has nine children, through relationships with seven different women (*see* PSR ¶¶ 78-85). Randy's inability to maintain stable relationships with his intimate partners or children throughout his adulthood is best explained by understanding the impact his early unstable environment had.

Having biological children with more than one partner is known as "multiple-partner fertility."[7] It has been found that for men who grow up in families and communities where a biological father is not present, these individuals are "less likely to maintain a commitment to the mothers of their own children" and experience a greater likelihood of "multi-partner fertility."[7]

---

[6] Gillman, A.B., Hill, K.G., & Hawkins, D. (2014). Long-term consequences of adolescent gang membership for adult functioning. *American Journal of Public Health, 104*(5), 938-945. doi:10.2105/AJPH.2013.301821

[7] Manlove, J., Logan, C., Ikramullah, E., & Holcombe, E. (2008). Factors associated with multiple-partner fertility among fathers. *Journal of Marriage and Family, 70*(2), 536-548.

Additionally, growing up in a "nonintact family in childhood is linked to nonmarital childbearing [and] poorer relationship quality."[7] Multiple-partner fertility is found to be more prevalent in disadvantaged communities where there is often, lower parental education and greater levels of poverty.[7]

When Randy became a member of the Rollin' 30s, he was looking for a place to belong, a family, he "wanted to be loved and not afraid." Unfortunately, the family that he found perpetuated delinquency, a maladaptive behavior, which has been found to have a negative impact on an individual's ability to successfully make the transition to adult statuses.[8] Adolescence is a "developmentally important" and "critical period" in the life course trajectory where one's experiences and exposure to events can have long-term consequences; it is also found to be the time of peak gang participation.[9]

One such long-term consequence of gang membership during adolescent can have "deleterious effects" on is parenting behavior.[9] Gang membership does not allow an adolescent to undergo a "normative pattern" of life events (i.e. finish high school, leave the family household, begin a full-time job, marriage and children) but rather gang members often experience "off-time transitions."[9] For example, many drop out of high school, which can "cut an individual off from prosocial attachments such as teachers and conventional peers from whom an individual can draw social support and guidance."[9] This is imperative to parenthood, which often requires "knowledge, skills and social support networks" in order for the parent to "cope with day to day stressors associated with parenting."[9] Further, adolescent gang members are more likely to engage in "early

---

[8] Augustyn, M.B., Ward, J.T., & Krohn, M.D. (2017). Exploring intergenerational continuity in gang membership. *Journal of Criminal Justice, 40*(3), 252-274. https://dx.doi.org/10.1080%2F0735648X.2017.1337556.

[9] Augustyn, M.B., Thornberry, T.P., & Krohn, M.D. (2004). Gang membership and pathways to maladaptive parenting. *Journal of Research on Adolescence, 24*(2), 252-267. doi:10.1111/jora.12110.

cohabitation" or living with a romantic partner outside of marriage.[9] Cohabitation has been found to predict "relationship instability and dissatisfaction" and increases the likelihood of later divorce.[9] Moreover, cohabitation is found to involve "frequent partner changes," which lead to instability in a household and can lead to "family and parenting stress."[9]

### D. *Finding and Losing Delia*

Prior to his incarceration Randy was engaged to Delia Diaz ("Delia"). Delia is the mother of Randy's youngest child, a daughter whom he has never had the chance to hold as she was born while he was incarcerated for this matter. Randy described Delia in two words: "family" and "stability." Randy and Delia have known one another for many years and were close friends long before they started their romantic relationship. Delia stated that she "felt safe and at comfort" when she met Randy and referred to him as her "best friend." Similar to Randy, Delia has come from a broken home. Her father was incarcerated, and like Randy she was raised by extended family. Determined not to let the past repeat itself, Delia stated that she and Randy planned to "get married, have a house together as a family and remain focus[ed] on working." Delia stated that she and Randy wanted to "do all the right things" so their "kids won't have to worry about college funds, or a place to stay" and to "make sure things are set in place so when [their] time is done on this earth [their] kids will have something."

Delia's worse fear became a reality, as her daughter is now living the life "she never imagined for her," a family broken up, a father incarcerated. It pained Delia that Randy missed her "pregnancy, sonograms" and has never had the opportunity "to get to smell, hold, [or] bond with [their] daughter." Nevertheless, Delia remains optimistic that Randy will be "given the opportunity to redeem himself" and "be a hard-working man and do right by his family." It is her hope that Randy will "be given a second chance to change his life around."

As of the writing of this submission, Randy has not physically met his daughter. Despite remaining supportive of Randy, the father of her daughter, Delia has made the difficult decision to end their engagement and romantic relationship.

## **EMPLOYMENT**

As noted in the PSR, when he was 13 years-old, Fernando would sometimes bring Randy and his brother Joey to his janitorial job with the New York City Public School System (*see* PSR ¶ 97). This experience allowed Randy to become a part of the New York City ("NYC") School Support Services, where he was able to complete numerous certifications and ultimately led to his employment with them starting in April 2004. As employment records show, Randy was employed from April 3, 2004, through 2018 with the NYC School Support Services working at various schools in the Bronx, New York as both a part-time and full-time cleaner (*see* PSR ¶ 100).

One of the schools that Randy worked at was P.S. 93 in the Bronx. Jonathan Kaplan was the Principal of that school and worked with Randy. Mr. Kaplan spoke with defense counsel and provided a letter in support of Randy (attached hereto as Exhibit D).[10] In his letter, Mr. Kaplan describes Randy as "an asset to our community," who "was always there to lend a hand and cared deeply about our children at school." At the end of his letter, Mr. Kaplan wrote that he "hop[es] that at some point Randy returns to our building so that he can resume his position  here at our school." (*See* Exhibit D).[11]

---

[10] Another employee of the New York City Schools, Diana Padilla, Main Office School Secretary, submitted a letter on behalf of Randy Torres, attached hereto as Exhibit E.

[11] Defense counsel had a frank discussion with Mr. Kaplan about Mr. Torres' conviction and the sentencing options available to the Court, while Mr. Kaplan fully understands the gravity of the situation he makes that concluding remark based solely on his first-hand experience and observation of Mr. Torres as an exemplar employee.

In 2018, Mr. Torres moved to Florida. While there, he was employed as a painter until the time of his arrest (*see* PSR ¶ 99). In fact, Mr. Torres was arrested in his painter's overalls.

Currently Randy works in his unit at the Westchester County Jail as a trustee. He delivers meals to other inmates and cleans the unit. Similar to his time with the New York City Public School System, Randy derives a sense of pride from his manual labor. It is his hope that at whichever BOP facility that he is designated to that he will have the opportunity to continue to work.

As an employee of a legitimate establishment, NYC School Support Services, Randy's continued involvement in the Rollin' 30s seems counter-intuitive, as one of the many reasons individuals join gangs is to make money and Randy was making money without the gang involvement.[12] Further, obtaining a legitimate way to earn money is often the reason many leave a gang.[12] However, an individual may encounter other perceived benefits by remaining in a gang, such as the human needs of love and esteem that membership in the gang may provide. As stated above, many youths join a gang as a way to fulfill the human need of "familial connections."[13] Once a member of a gang, an individual becomes a part of a cohesive group and this is an "attractive" element for those who are unable to have this need fulfilled in their home environment.[13]

Similarly, self-esteem and being held in high esteem by others are other important human needs; evidence suggests that these two forms of esteem are "reciprocal" of one another

---

[12] Young, M.A., & Gonzalez, V. (January 2013). *Getting out of gangs, staying out of gangs: Gang intervention and desistence strategies.* National Gang Center, Office of Juvenile Justice and Delinquency Prevention and Bureau of Justice Assistance, United States Department of Justice.
https://nationalgangcenter.ojp.gov/sites/g/files/xyckuh331/files/media/document/getting-out-staying-out.pdf

[13] Sonterblum, L. (2016). Gang involvement as a means to satisfy basic needs. *Online Publication of Undergraduate Studies (OPUS), 7*(2), 37-41. https://wp.nyu.edu/steinhardt-appsych_opus/gang-involvement-as-a-means-to-satisfy-basic-needs/

that is "our perceptions of ourselves [is] directly related to how we think others see us."[13] Youths who encounter peer rejection, often are found to have low self-esteem, which is a factor that has been found to predict gang membership.[13]  As a means to fulfill one's need for self-esteem they may be willing to "do nearly anything" to gain respect and thereby prove their worthiness, which gang membership provides in the form of "street cred" or simply by a gang's reputation of "power and prestige in a given neighborhood."[13] Lastly, gang membership provides individuals who are "marginalized in other aspects of their lives" a sense of power.[13]

## COMMUNITY INVOLVEMENT

Over the years, one of the ways, Randy used the power and prestige that came with his membership in the Rollin' 30s, was giving back to the community that he grew up in by holding various youth sporting events. Randy's chaotic childhood did not allow for him to join organized sports; however, the one positive impact school had on Randy was his introduction to basketball, a sport he excelled at while a student, despite his small stature. In an effort to provide for similarly situated youths in the Bronx, Randy used his standing in the gang to try to bring more athletic opportunities to his neighborhood.

As the PSR notes, Randy was involved in the creation of a chapter of "Gloves Up, Guns Down"[14] a nationwide program that provides at risk youths an opportunity to learn proper discipline in an effort to stop violence through boxing (*see* PSR ¶ 96). Randy himself got into the sport of boxing as a pre-teen as way to learn how to protect himself from the bullying he experienced and street fights. More importantly, he realized that boxing allowed him an outlet

---

[14] "Gloves Up, Guns Down" sometimes referred to as "Guns Down, Gloves Up" is a program found in numerous cities in the U.S. such as Chicago, Philadelphia and Indianapolis as a way to provide at risk youths with ways to safely resolve conflict by learning to box. *See* https://chicago.cbslocal.com/2020/09/24/gloves-up-guns-down-teaches-kids-the-skill-of-boxing-to-prevent-gun-violence/; https://philadelphia.cbslocal.com/2021/04/28/guns-down-gloves-up-boxing-philadelphia-police-program/; and https://www.wishtv.com/news/local-news/indy-restarts-safe-summer-events-friday-nights/

to get out his frustrations and gave him confidence. However, by the time he got involved in

boxing, he was already a member of a gang and because of his small stature, he used his boxing

skills to settle scores or protect others he cared about. It is not something Randy is proud of, but

he does not hide from this Court that he engaged in fistfights throughout his life.

Growing up in the time and place that Randy did, he was not exposed to the great ideas

behind programs such as "Gloves Up, Guns Down," which thankfully now exists to teach a new

generation of kids about channeling their energy into a sport and staying away from violence.

Nevertheless, Randy's participation in creating community-based programs for children,

growing up in an environment similar to his own, are part of the many recommended ways to

promote gang desistence.[15]

## (NO) CRIMINAL RECORD

The first time Mr. Torres was ever arrested was when he was 26 years-old, and his case

was ultimately dismissed. His sister Marilyn M. had been attacked in the Bronx and her attacker

had stolen her phone. In response, Mr. Torres found the man, punched him in the face, and

retrieved his sister's phone. Resorting to physical violence to solve problems is not an

acceptable response in civilized society. However, Randy's response, as discussed above, is an

example of how his socialization through gang membership can have long lasting effects. Taken

in this context, the choice to find this man and fight him (without weapons) while wrong, is to

some extent understandable.

The PSR lists other arrests; however, Randy Torres stands before Your Honor as having

never before been convicted of a crime. Given his commitment to his many family members

---

[15] Leap, J. (2013). Changing course preventing gang membership, *Chapter 8 – What should be done in the community to prevent gang-joining?* U.S. Department of Justice, Office of Justice Programs, National Institute of Justice and U.S. Department of Health and Human Services, Center for Disease Control and Prevention, National Center for Injury Prevention and Control. https://www.ojp.gov/pdffiles1/nij/239234.pdf.

and his long work history, it is clear that Mr. Torres has the ability to be a law abiding and productive citizen.

## **COVID-19 PANDEMIC**

The Court is no doubt familiar with the devastation and hardships caused by the COVID-19 pandemic ("pandemic"). Additionally, the Court has likely heard about how the jails' unsanitary conditions have made this difficult time even more challenging for inmates. Therefore, this section will speak to the uniqueness of Mr. Torres' experience while incarcerated during the pandemic.

For most Americans March 15, 2020, changed their worlds forever, but even before the pandemic was declared, Randy was facing difficult, and at times, inhumane conditions. Shortly before Mr. Torres' trial began, he was transferred from the Metropolitan Detention Center ("MDC") to the Metropolitan Correctional Center ("MCC"). In late February early March of 2020, the MCC was on severe lockdown due to a firearm being smuggled into the facility.[16] This began days of 23-hour lockdowns and inmate cells being searched and tossed and personal effects confiscated. For Mr. Torres, he was deprived of his legal papers as well as food and hygiene products that he purchased from the commissary with money he received from his family members.

When the pandemic swept in, Mr. Torres' unit was no longer staffed by Corrections Officers but solely by members of the MCC's Special Operations Team. As the initial surge of the pandemic wore on, Mr. Torres was subjected to 24-hour lockdowns and was afforded only a 5-minute shower every three days. Eventually, Mr. Torres was transferred to the Westchester County Correctional facility in Valhalla, New York.

---

[16]   *See*   https://www.nbcnewyork.com/investigations/lawyers-furious-as-mcc-lockdown-enters-day-8-probe-for-alleged-smuggled-gun-continues/2314203/

While initially the conditions were more humane and less restrictive, the inmates in the "Penitentiary" facility were moved to the "Old" facility in order for Westchester County to improve the air filtration system at the "Penitentiary" facility. Mr. Torres lived at the "Old" facility from January 2021 to April 2021 during which time the water was often brown, and the heat often would not work, especially at night.

Perhaps worse than anything was the isolation he suffered from friends and family. Mr. Torres went 15 months without having a family visit. In June of 2021, Mr. Torres was finally able to see his then fiancé Delia in person. Unfortunately, she was not allowed to bring their young daughter with her to the visit. Mr. Torres respectfully asks the Court to consider his incarceration during the pandemic-era and to apply an appropriate reduction to whatever the Court feels would otherwise be a just and fair sentence.

## ADDITIONAL § 3553(A) CONSIDERATIONS

In New York State had Mr. Torres been convicted of Murder in the Second Degree, with his lack of a criminal record of any kind, he would be facing a minimum sentence of 15 years to life and a maximum sentence of 25 years to life. However, the more adequate comparison under the facts here would be New York State's Manslaughter in the First Degree which carries a minimum sentence of 5 to 15 years and a maximum of 8 1/3 to 25 years.

Mr. Torres is now 41 years old. It is likely that any sentence imposed by the Court would see Mr. Torres released after his 50th birthday. No doubt the Court is well aware of the various statistics that show the relationship between recidivism and age and that most individuals "age out" of crime. Further, it is less likely that upon release back into society that Mr. Torres would return to the gang life due to the fact that his advanced age is a deterrent and moreover, this

prosecution has decimated the gang he was a member of. Therefore, if Mr. Torres were to be released back to society, the likelihood that he would engage in further criminal activity is minimal.

## **CONCLUSION**

As discussed above we assert the proper sentencing guideline calculation in this matter is a range of 135 to 168 months. A sentence within that guideline range is sufficient but no more than necessary to satisfy the factors set forth in 18 U.S.C. § 3553 (a). Should this Court find the guideline range to be otherwise, we still believe that such a sentence, between 135 to 168 months, is appropriate and that a sentence of greater than 240 months is substantially more than necessary to satisfy the factors set forth in 18 U.S.C. § 3553 (a).

Therefore, we respectfully ask this Court based upon the factors set forth in 18 U.S.C. § 3553 (a) to sentence Randy Torres to a term of incarceration between 135 to 168 months.

Respectfully Submitted,

_____\S_____
Sam A. Schmidt, Esq.
THE LAW OFFICE OF SAM A. SCHMIDT

_____\S_____
Andrew M. J. Bernstein, Esq.
Partner
ARMSTRONG TEASDALE LLP

*Counsels for Randy Torres*

# EXHIBIT A



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 2, 2019

**BY EMAIL**

Counsel for Randy Torrez, Walston Owen, Charles Ventura, and Emil Matute

Re:   *United States* v. *Randy Torres, et al.,* S7 16 Cr. 809 (VM)

Dear Counsel:

The Government writes to provide information regarding three violent acts that the Government presently intends to prove at trial. Please note, however, that the inclusion of particular material in this letter does not necessarily indicate that the Government believes such material is exculpatory and subject to disclosure under *Brady v. Maryland*, 373 U.S. 83 (1963); rather, the Government has intentionally been overbroad in its disclosure as a courtesy.

Please note that the below disclosures and attached materials are governed by the Protective Order entered on March 21, 2017. Furthermore, in the course of making the below disclosures, the Government has withheld information regarding certain witnesses that would directly or indirectly identify – and thus endanger – these individuals.

**September 19, 2015 Homicide of Nester Suazo**

Following the death of Nester Suazo in September of 2015, the Bronx County District Attorney's office filed homicide charges against Jaquan Monroe, "Dough Boy," case number 3563/2015. Monroe was acquitted of the homicide after a jury trial. The Government anticipates that evidence at the trial in the instant case will establish that Monroe is an associate of the Rollin' 30s Crips who had access to the weapon used in the homicide. The Government is the process of unsealing and reviewing the Bronx County record and will promptly produce any relevant *Brady* material.

**April 16, 2016 Shooting**

As set forth in the Government's June 4, 2019 letter, the Government anticipates offering evidence at trial that Randy Torres and another individual participated in a drive-by shooting against a member of the Certified Crips in the vicinity of Bruckner Boulevard and Colgate Avenue in the Bronx, New York. In or about November 2018, a cooperating witness ("CW-1") reported to law enforcement, in sum and substance, that the victim of the shooting ("Victim-1") did not know who shot him but did not believe that Torres committed the shooting.

Please do not hesitate to contact us should you have any questions regarding this disclosure or any of the other discovery materials in the case.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney

by: _____/s/_____
Jessica K. Fender
Anden Chow
Jacqueline Kelly
Assistant United States Attorneys
(212) 637-2276/ 2348/ 2456

# EXHIBIT B

My name is Marilyn Adorno I'm Randy Torres sister he has always been a part of my life we grew up together he's been more than a brother to me and more like a father figure in my life and for my daughter has well. Randy has taught me a lot when my parents separated. Because of him I had the backbone and the extra push that I needed when I felt like my world was crumbling. Due to my mom being always ill and hospitalized it was Randy who took care of me and protected me growing up. He got up every morning to take me to school and then would pick me up after school. I look back now and wouldn't want it no other way but in high school it was so embarrassing to have your brother walk you home every day. But he was my protector. He always made sure he was present for parent teacher night because my dad was busy at work and couldn't leave and my mother had passed away. Although he was strict with me I thank him today for showing me that I can be and do anything when I put my mind to do something. We weren't prepared for half the horrible stuff we went through together growing up but as siblings we made things work. He did this through his income working in maintenance.

This case has affected me so much after his verdict. I have fallen into depression and have yet to return back to work as a retail supervisor after the quarantine. I have witnessed my oldest brother Joey deteriorate. He has lost a large amount of weight and he doesn't sleep and we fear of losing Joey to depression because Joey feels he failed Randy and I. Joey had left home and gone to college to play basketball when Randy and I struggled so much with trying to survive mainly on our own. But Randy was proud of his brother Joey for trying to make a better life for himself. We have lost so much as a family. When we lost our mother it was very hard on Randy but he was there for me and all of us in our family. We are here for him and we ask that he be allowed to come home someday to see his family who we always supported and cared for.

 I have been left with unanswered questions and I have no explanations for my daughter and nieces and nephews. I just tell them he loves them. Please take what I say to heart when my brother who protected me for so many years stands in front of you at his sentencing.


Marilyn Adorno

# EXHIBIT C

**From:**            Maira Villanueva
**Sent:**            Tuesday, September 29, 2020 7:27 PM
**To:**            Katelyn Wasserman
**Subject:**

Honor Victor
Marrero
     Hello my name is Maira Vlilanueva. I am the aunt of Randy Torres by marriage. I have known  Randy since he was born. I love Randy and cared for him like he was my own son. Randy is a very lovable and friendly person. He has a heart of gold. Randy is a kid in a man body. He likes to joke a lot. Randy is a very lovable son. He was very close to his mother. When she passed away it tore his heart into a million pieces. He still mourns for his mother. Randy is a lovable brother to his siblings. They are very close to each other. If Randy was to come out I would bring him to live in florida with my husband which is his uncle, my son and myself to give him a better life. His uncle and I own our own business and I will put him to work with us. While Randy was growing up he would take some of the kids around the neighborhood and take them to the park and teach them how to play basketball. Randy is very loved around the neighborhood where he grow up
at.

                              Thank You,
                              Maira Villanueva

# EXHIBIT D

Mr. Jonathan Kaplan

December 8, 2021

Hon. Victor Marrero:

RE:     *Character Letter for Mr. Randy Torres*

To the honorable Victor Marero, this letter is in reference to Randy Torres. My name is Jonathan Kaplan and I am the Principal of P.S.93 in the Bronx. Randy was a cleaner at our school building since my employment in September 2012. Randy was the first member of the custodial staff to come to me and welcome me as the "New Principal" in the building. Since that time and up until he was no longer employed here, he showed himself to be an asset to our community. He was always there to "lend a hand" and cared deeply about our children at school. Randy spoke fondly over the years about his own children and his wanting to support them wherever he could. I could always count on Randy for anything in our building. He was detailed oriented in his cleaning assignments, but always involved himself where needed outside of his job description. The children at our school liked his demeanor and his sense of humor is remarkable. I am hoping that at some point Randy returns to our building so that he can resume his position here at our school.

Thank you for reading this letter.

Sincerely,

# EXHIBIT E

Dear Hon. Victor Marrero:

This letter is in reference to Randy Torres. I would like to express positive remarks on his behalf. Mr. Torres and I worked together at School 08X093 in the Bronx. I am a Main Office School Secretary and I have known him since 2015. When I first met Randy he was quite shy during the first few months of working together. However, he had a regular afternoon shift and those were the moments we got to speak and get to know each other better because the office flow was not as crazed as in the mornings. Through those conversations and seeing him interact with others, I got a good sense of who he is. Randy was always hard working and responsible while at work. He was kind to all and got along with everyone. He always would take time to speak in a positive and friendly manner with any of the students that he came across during his workday.

From what I know, I believe that Randy is a person who cares about other people, always works hard, and treats others kindly. While incarceration must be very difficult on him, I believe that when Randy is released, he will again be someone who is kind and works hard. I hope my thoughts on Randy as a former co-worker are helpful to knowing a little more about him. If you have any questions, please feel free to contact me. I have provided my email and cell phone number to Mr. Bernstein and have allowed him to share them with the Your Honor.

Thank you.

Sincerely,

Mrs. Diana Padilla

# EXHIBIT F

Dear Hon. Victor Marrero,

My name is Griselle Adorno. I am Randy Torres' cousin. I have known Randy for about 14 years and have always had an amazing relationship with him. I am a 25-year-old mom of one and a Supervisor for CVS HEALTH where I have been employed for 5 years.

Randy has been one of the most positive people I have met in my life, no matter the situation or what's going on he always tries to make a laughable moment. I have witnessed Randy with many of his children and how he is with them from the moment they are born, he is nothing but super loving. His children bring out the kid in him.  I always remember how he would take his daughter Amari out front just to play basketball every day. When Randy's son Noah was born he was all about him, all day spoiling him, they were truly inseparable. He worked overnight and would come home to sleep a few hours and then be back to take over his daddy duties.

I often would go over to spend family time with Randy, his kids, his sister Marie and his niece Zeina.  Zeina and Randy have been close since she was little, since she had no father figure in her life, Randy always acted as one. Randy has also taken on the father role for my younger brother Felipe.  Since our dad passed away when we were younger, Felipe was always in a dark place. However, as he grew a bond with Randy, he started opening up and becoming a more responsible adult.  Randy stepped up, helped my brother get through life, and shared with my brother his own feelings on how he felt about not being able to spend time with his own dad.

When my son Mason was born, Randy was super excited to meet him and came over right away when we got home. If Randy were out now I know he and Mason would have an amazing bond because they are so similar.

Randy was at every celebration we had, birthdays, Christmas, New Year's, and religious events which we always celebrate big. I remember at each event, Randy would be the life of the party, always dancing and making everyone laugh from the moment he walked in.

This situation has personally affected me and my family greatly. We have shed so many tears as a family and no holidays or events are ever the same now. Randy gave us a spark no one could ever give us and his absence has left us feeling a bit empty. My brother who he truly inspired and helped get through some dark times has been placed almost in the same spot as when we lost our dad by not being able to have his father figure to constantly talk to or let his feelings out to. My son Mason is unable to have a bond that many of us got to experience and will not be able to because of this situation. I hope that you can consider all that Randy means to us during his sentencing and give us all hope that we will soon have the light of the family back with us.

Thank You.


Griselle Adorno

# EXHIBIT G

June 7, 2021

Dear Hon. Victor Marrero,

My name is Michael Adorno and I am Randy Torres' cousin. I work as a retail store manager. Also I am a priest of the Yoruba lukumi religion.

I was born in Puerto Rico and raised in the Bronx, NY. I came to NYC when I was the age of 9 years old. At first I was heartbroken because I left all my family and friends in Puerto Rico. Then I met my cousin Randy and his siblings and I was excited to have family here. Randy is the funniest, friendliest and most caring person you can ever meet. He is an awesome father, son, brother and cousin. He is the type of person who will take his food off his plate to give it to you if you need.

When I first got initiated into the religion that I am a priest in now Randy was my main mentor and teacher he taught me the morals and principles of our religion. He is also one of the most hard working guys I know. He has worked in the Board of Education for years. He loved being around people and helping kids and really helping all people in general.

Randy is the joy to our family it breaks my heart to see my family so sad by not having him around us for holidays, regular family get togethers and religious functions. Randy was always the one to get all of us under the same roof. We are a big family full of responsible hardworking people and we support each other in making our lives positive. The day when Randy comes home will be the day everyone's happiness will come back. We will be there for him as he has always been for us. We can provide new shelter and a positive environment and anything else he needs.

Thank You.

Sincerely,

Michael Adorno

# EXHIBIT H

Dear Hon. Victor Marrero,

My name is Reverend Pamela Palmer and I am the Godmother of Randy Torres. I have been Randy's "mother" since my dear friend, Marilyn, his biological mother passed away. What I have seen from Randy over the years is that he is not a bad or evil person. What I have witnessed and come to know is that Randy is a great family member and friend. A kind and humane individual.

I sat in court every day during the trial. I heard a lot of stories that did not describe the person that I know and have known for many years to be. I'm writing this letter on his behalf because I feel that the Randy I know and the good deeds that I have witnessed should also be known to Your Honor. Yes, he was in a gang. But he also worked every day. He worked for the Board of Education for a long time.

His job with the Board of Education was fulfilling to him. It was in his community and with a lot of kids who had traumatic upbringings like him.    Although he was not a teacher he made an impact on those students. In particular, I know from Randy's coworkers, some of whom are family or close friends, that Randy was known for taking the time to speak with younger people to encourage them and let them know that they could do better. That is very consistent with what I have seen in our community. Randy has been a big brother and father figure to so many.

Randy is generous. And generous with his most precious gift, his time.  I'm a senior citizen and one of the many that Randy has helped in so many ways. Whether helping us with our groceries. Running an errand. Or, unlike many people his age, just willing to sit with an older person in the community and listening.  When I became sick, he would walk from his job to help me by going to the store, getting my medicine from the pharmacy, even combing my hair when I couldn't. Randy has lifted me off the bed and carried me to the bathroom when I couldn't walk. He sat with me when I was depressed because I could no longer do things for myself. He is a wonderful "son."

Randy is a loving father to all his children even those that are not his biological children. I am the mother of nine daughters, and he is a big brother to all. His children call me grandma and he make sure that they stay in touch and respect me. My own grandchildren love him dearly. He's fun, understanding, selfless, and kind with a heart of gold. I admit there are some complications to those relationships because Randy is engaged to Delia and not with the other mothers. But nonetheless he is a loving father who wants his children to be good people.

The pandemic has been tough on me and has limited my contact with Randy but I try to speak with him every day and at least every week. We pray together on the phone. When we do video chats I see the tears, I feel his pain as he is separated from me, his fiancé, and his children. Life has been so hard for Randy but I want you to know that through his pain and suffering, which has been great over the years, he never lost his compassion for others.

Thank you.

*Pamela Palmer*
Pamela Palmer

# EXHIBIT I

Dear Hon. Victor Marrero,

I've known Randy Torres and his family since I was five years old. Randy has always been a big brother to me ever since we were little. At times he would come to my home and talk to my mom to make sure I came out. He always looked out for me when I needed him. In the summer he would always go to my house and tell my mom that he will make sure I'd get home safe every night. At times while growing up we would split $5 for each other to eat every day. Randy always gave me advice to stay in school, not to argue with my mother and to always keep a positive outlook on life. Whenever I have doubted myself Randy would always be there to give me a pep talk. Randy has played a big positive role in my life.

Sincerely,

Franklin Pina

# EXHIBIT J

October 2, 2020

Zayquan White

Dear Hon. Victor Marrero,

Good evening my name is Zayquan White I'm a close friend of Randy Torres. I've been around Randy for over 15years. First time I ever saw him was at the PAL it a after school program for kids that want to play sports. He was boxing I was in to softball at the time. Everyday after practice we would laugh and joke all the way home. Randy is a comedian most of the time , he knows when to say the right joke a the perfect time to make every moment a classic moment. I come from a good home, I finished high school then went to get a trade in automotive. As of now I'm working in a hospital as a floor technician. You may be wondering why am I cleaning floors instead of replace car parts is because I miss my friend. That was Randy's job, He walked to work everyday, no matter what. He should me how to stop having excuses for things and do something about it. That goes for weight lifting, basketball, running miles almost everything we was doing. This is not my dream job this is something I've been doing for years with Randy Torres that I enjoyed when I had the spear time. I'm a very detailed person I prefer everything neat and clean at all times it's a wonderful feeling. Witch leads me to my next career goal. I plan on starting my own car detailing business. I'm detriment to make that happen so Randy can help me grown my business. Randy's absence is really putting a lot of weight on my shoulders I couldn't imagine how his kids are feeling inside. He also The Godfather of my son. I remember One year he had a surprise birthday party set up for me I wasn't expecting that at all I would never forget that. Randy is one of a kind he has a big heart that pumps love and knowledge is gold. Randy attach to everyone he's around and they start to love him for the type of person he is, and then there's some that don't. Randy want me and everyone to achieve what ever goal or dream I have and get it done. For the one's that don't it's jealousy and envy a terrible combination. They would say anything to make him look bad, Randy's response to that would simply be sticks and stones move on. We took a lot of losses together and got through the pain, it would kill me in side if I lost him forever.

# EXHIBIT K

**From:**   david Suarez
**To:**   Katelyn Wasserman
**Subject:**
**Date:**   Friday, October 2, 2020 9:53:00 PM

To Whom May Concern,

My name is David Suarez, a long time friend of Randy Torres. I'd say we knew each other for about 10 Years, making me the 14 years old when we met. At an age that young, my life wasn't all that great. I would not go to school everyday and eventually be taken away into a group home system. None of which was Randy's fault, just a mistake on my own teenagers tend to make. When I was released from the group home, which by the way was named Pleasantville Cottage School. A campus full of lost kids including myself or even kids at need of a parent who didn't have one. When I was released I went through a lot of things, such as living issues with my mom because we were poor at the time. Days went by where I had no food, no one to talk to even times where my lights got cut off at my home because we couldn't afford the bill. At an age so young I went through a lot not knowing what to do with myself. I didn't have my father in my life, just my mom struggling to take care of 6 kids on her own. I reached a deep depression. Even wanting to take my own life at one point. Randy Torres was someone who I vented to, about everything that was going on in my life. Randy offered me a support as a father figure, an older brother and that someone I can look up to. As previously stated, my lights at my home were cut off, where I explained to Randy what I was going through at the time. With his own struggles, working hard at the school, taking care of his kids and paying his rent, Randy offered me help. He asked me to come over to his home where he then gave me $150 to pay for my light bill which was from his rent money. He went on to tell me " I wish I can give you more, but it's all I have and I rather help you out because I know the feeling of not having anything. You know I'm here for you. Finish school and try to get a job so you can help your mom. Always cherish your mom because you only have one mother. " he went on to give me half of his plate of food. Randy is a wonderful great hearted person. This is, one of many things he's done for me. I can go on to write a book. I started to get motivated by daily advices he would give me. He also explained to me about his religion which is called " Yoruba Lucumi Religion ". Randy is a priest in the religion. He guided me through the religion in explaining what it's about and talking/praising the Orishas. Nothing was forced on me but I was definitely interested in knowing more. That became a motivational goal of mine to learn, practice and even join the religion. Which I did with the thanks of Randy Torres. As I focused more on school and speaking to Randy every day in learning more about the religion, I saw hope. Hope In changing my life in becoming a better man. I went on to graduate and get my High School Diploma. I found a job and things really started to turn around for me. Randy was there every step of the way in guiding me and praying for me religiously. With the thanks of Randy Torres, today I am a Lucumi Priest. Helping others who are in need where I once was myself. I am a Store Manager at Autozone, I have my own home and I drive my own car. I give Randy all the thanks in the world in helping me get to where I am today. It hurts me to see the position he's in, because I know how much of a great person he is and how much he has helped me. My blessings in return to him always.

Sincerely,

David Suarez